# Exhibit 1

---------- Forwarded message ---------
From: **Randy Allmon** <randy.allmon@gmail.com>
Date: Tue, May 21, 2019 at 10:17 AM
Subject: Fwd: Business Loan
To: Annelise Pedersen <annelisemp@hotmail.com>

---------- Forwarded message ---------
From: **Ron Anderton** <simplecashflowsolutions@gmail.com>
Date: Wed, May 3, 2017 at 1:23 PM
Subject: Business Loan
To: <randy.allmon@gmail.com>

Randy,

I have attached a couple of case studies explaining working capital, which is one of the areas I need funding.  Banks will not give me the credit line until I have business income for 3-6 months.  That is why I am asking Annalisa and you for a bridge loan of $120k-$220K.  You will be fully repaid principle plus interest (8%-12% or whatever we can work out) in 1 year, in time for next years taxes.  Thus creating a win-win situation.  Here is a rough overview.

**Collateral:**

We have $100,000 of equity in our Idaho home
We can sign a loan agreement or whatever documents you require
$50k would be sitting in the business bank account

**What we plan to do with the money:**

**1.**  We are selling our Idaho home and need 20k to cover time to get tenants out, time needed make necessary repairs, cost of repairs and close on home. (Owe $135k + $20k = sell for $275k - closing costs = at least $100k profit)

**2.**  We are buying a fix and flip in Provo.  20k down + 20k repairs + 9 months time = 50k  (Buy for $270k + 50k invested = sell for $390k - closing costs = at least $50k profit) We would live in it to further cut costs while repairing it.

1

**3.**  I have already talked to bank and if I have $50k avg daily balance in business account and flow these expenses and profits through account after 6 months he guaranteed approval for $100k business loan to continue business operations.

4. Working Capital Fund for business I am involved in.  The loans we are funding right now are averaging 3 month terms for $10k-$20k each.  We need $200k additional funding this month for loans and will need $1million within 6 months for predictions.  My partners are also working on getting additional funding for our internal syndicate.  $100k for my portion would be ideal.  This $100k would grow to over $200k in 1 year)  I would be able to repay you plus interest and still have have my own $100k now invested to keep this going.

All of these I feel are very good investments.  I have been conservative on estimates and projections for profit and aggresive on cost estimates.  Your principle is very low risk for any of these transactions being backed by real estate 1&2, cash 3 and individual & business assets on all the working capital loans we do.   Your help would really set us up for success.  Your $220k loan would provide you with a nice interest rate over the next year and give us $250k in profit and $100k in business line of credit giving us the boost to make this perpetual.

Since I do not know your availability of funds, desired level of participation, or comfort level with this. I will get this sent to you and give you a call,

Thanks,

Ron

## Whitepaper – A Case for Working Capital Syndication
*02 April 2017*

Politicians will claim that the credit crunch of the recession is over, but ask any business owner and they will tell you otherwise. Obtaining credit, even under less-than-favorable terms, remains extremely difficult. A review of bank's own results paints a far bleaker story. Last year, nearly 2/3$^{rds}$ of businesses sought financing, but 86% found themselves outside of the bank's narrow box. Only 14% were approved for the funding they applied for. Business owners spend precious time away from their businesses filling out bank forms, submitting documents for underwriting, and meeting with bankers, all to be told "no" far more often than not.

In the past, many business have received funding from Small Business Administration SBA loans. These were often the best option for liquidity. The federal government would underwrite some of the risk of making loans to small business, making it much more palatable for banks to grant these loans. However, increasing paperwork for compliance regulations have made it unprofitable for banks to issue small balance SBA loans. From the bank's standpoint, it takes almost as much effort to underwrite and comply with regulations for a $500,000 loan as for a $15,000 loan. Thus, the small dollar credit window is barred shut.

What is a business to do then? If a business owner has savings or can rely on family and friends for capital on favorable terms, then they should often pursue that first. But what if they don't have preferential access, or have otherwise exhausted resources including personal credit cards and retirement accounts, yet still find themselves in need of capital for expansion or operations? This is where the asset backed lending (ABL) market excels and provides a solution for disadvantaged business owners.

Asset backed lending is flexible funding that uses a company's balance sheet to underwrite funding. Nearly everyone is familiar with the ABL segment of mortgaged real estate lending. Most are also familiar with equipment lease financing, a trillion dollar a year business. Factoring refers to the process by which a funder purchases the future receivables of specific invoices and fronts that capital to a business before the client actually pays, providing additional liquidity. All of these options provide capital to a business and are typically preferable when these superior assets exist.

Sometimes, though, businesses don't have a lot of hard assets that are unencumbered. Yet, it is easy to see that the greatest asset of such a business may be the fact that customers come back again and again to purchase that company's goods and services. A regular, steady flow of customers may actually be a stronger piece of collateral <u>and</u> more predictable in value that archaic equipment, encumbered real estate, or questionable invoices.

Working capital financing seizes on this fact, and uses the future stream of revenue as the basis for lending. Formally, working capital funding is the purchase of a company's future receivables at a discount. For example, the working capital funder may offer to purchase from Sadie's Boutique $15,000 of her future receipts to be received over the next 60 business days, paying $10,000 now for that portion of that future AR payment stream. The funder fronts Sadie's Boutique the $10,000 in an ACH funding to Sadie's

Boutique's account. The funder will then debit from Sadie's account $250 each day for 60 business days. With this $10,000, Sadie can do anything she likes. In this example, she uses it to buy inventory in advance and at a significant discount for an upcoming sale she has advertised. That $10,000 of inventory is sold at her typical mark up of 2.5x, or $25,000. After deducting $2,500 in internal expenses plus the cost of the advance, Sadie nets $12,250 in additional profit from the transaction. She can then use her profit to self-fund her next big sale, or can engage in a working capital line again to gain additional leverage and have the potential for increasing her profits even more.

The rates of working capital advances are expressed as a factor rate and a time period. In our example, Sadie received $10,000 now for $15,000 in future receivables. This is a 1.50 factor rate. The time period in our example is 60 business days, or 12 weeks. The payment for most working capital advances is paid through a daily ACH deduction. The calculated deduction is figured by multiplying the funding amount by the factor rate then dividing by the number of business days and processed as a daily ACH, which is $250 in our example.  It is important to remember that a working capital advance is not a loan and there is no interest rate, APR or loan documents. It is buying future receivables at a discount. It is expensive, and business owners need to realize that it is much like pouring gasoline on a fire, or in this case, the business's operations. If the operations are profitably managed, the advance of capital well deployed, at positive net margins, can supercharge profitability and enable growth and expansion far quicker than organic growth would allow. However, if a business is not well run, or the capital is squandered, or if the owner is already in peril from running at insufficient margins.  Then the advance will only serve to accelerate the company's demise. It was already in trouble, and the advance only accelerated it.

When underwriting a working capital advance, funders will look at factors such as bank beginning and ending balances, number and amount of deposits, nature of deposits, average ledger balance, number of negative days or NSF's, time in business, industry, credit profile of the principals including FICO scores, liens, judgements, child support status, bankruptcies and home ownership status, and the performance of prior advances and loans.  In the higher risk spheres, funders will often rely on the underwriting of more mainstream funders, feeling like they can add a margin of additional funding in subordinated position to other funding without much additional risk. Interestingly, the default rates are pretty consistent across credit profiles, but seem to depend most on the length of the advance. Thus, higher risk funders can preserve their default rates by condensing the time frame of the receivables collection.  This term contract also does wonders for the IRR of the portfolio.

Funders incur the most risk when originating a new transaction. Funders seek to maintain clients by renewing funding or increasing funding lines. Care must be exercised, however, since imprudent stacking can sink an otherwise well performing business and can lead to unexpected defaults.

The factor rates collected by working capital syndicators can be attractive. On the low end, A-credit clients with strong balance sheets and income statements may receive factor buy rates (the rates before broker commissions and origination fees) with one year terms as low as 1.12.  On the higher end, clients with subpar credit and financials may be receive 90 day terms in excess of 1.60, and brokers may add as much as 20 points or more onto the factor buy rates.

With defaults driven more by term length than any other factor, risk can be managed by making shorter

term advances in reasonable increments. Short term lengths also benefit the syndicator by increasing the turn on funds, and thereby the IRR.

As an example of accelerated return via compounding, if a syndicate were to enter into 10 transactions like Sadie's example, the syndicate would advance $100,000 to 10 clients in exchange for $150,000 of receivables over the next 60 business days. That means $250 would be collected each day from each of the 10 clients, or $12,500 per week. But at the end of the first week $12,500 would be ready for additional transaction and could be placed with a new client origination. So, the 2nd week, $12,500 would be collected from the original 10 clients plus $1562 from the new client for a total collection of $14,062. If this $14,062 were again advanced in week 3, then the 3rd week's collections would rise by an additional $1758, and each subsequent week the collections would rise by another 12%. Of course, this is an overly simplistic example as allowances need to be made for broker commissions, originations, collections, default rates, and friction against full portfolio engagement.  But the principle of rapidly increasing weekly collections that can be re-syndicated is a powerful concept and one that can cause the IRR to increase dramatically.

In summary, there is an urgent need for working capital funding. Banks are not lending to a wide spectrum of American businesses who need the capital for operations and expansion. Business owners will seek the most advantageous terms they can secure, but with banks withholding solutions from Main Street merchants, business owners remain in need. Working capital, even with high factor advance rates, can be profitable for well run businesses, adding a bit of gasoline to the fire of properly managed businesses. Working capital syndicators may receive superior returns from the purchase of receivables via working capital advances, and can compound their return by redeploying capital into additional transactions as soon as possible after each day's collection for merchant clients. Risk is present in all transactions, but via proper asset backed lending to well-designed client models and modern portfolio management, many risk factors can be mitigated.

Source: Aspire Lease and Factor LLC



**Aspire Lease and Factor**
**3305 Mayflower, Ste 3B**
**Lehi UT 84043**
**(949) 478-2670**
contact@AspireLeaseAndFactor.com

Notice:

EVERYONE THINKS THESE DISCLOSURE STATEMENTS ARE LAME, AND WRITER IS NO EXCEPTION, YET SOMEHOW LEGAL COUNSEL ALWAYS ADVISES INCLUDING A SILLY DISCLAIMER ALTHOUGH IT IS QUESTIONABLE WHETHER DOING SO HAS EVER HELPED ANYONE. TO PROVIDE EXTRA PROTECTION, THIS WARNING IS EXTRA SILLY, NEVERTHLESS PLEASE TAKE HEED. PLEASE BE AWARE THAT THE CONTENTS OF THIS WHITE PAPER (AND ANY ATTACHMENTS) ARE PRIVATE AND ARE INTENDED TO STAY PRIVATE, AND MAY CONTAIN CONFIDENTIAL OR PRIVILEGED INFORMATION. SHARING PRIVATE INFORMATION WASN'T NICE IN KINDERGARTEN, AND IT IS NO BETTER NOW THAT YOU ARE SUPPOSEDLY MORE MATURE. IF YOU RECEIVED THIS COMMUNICATION IN ERROR, PLEASE PROMPTLY NOTIFY THE SENDER THEN IMMEDIATELY DELETE THE CONTENTS OF THE COMMUNICAITON.

THE WRITER OF THIS WHITE PAPER ENGAGES IN COMMERCIAL LENDING SERVICES AS PROVIDED BY LAW. CLEARLY, WRITER IS NOT ENGAGED AS YOUR ATTORNEY, ACCOUNTANT, TAX ADVISOR, INVESTMENT ADVISER, BROKER, CONSUMER BANKER, REAL ESTATE AGENT, MEDICAL DOCTOR, PSYCHOLOGIST OR LOVER.  IF YOU NEED TO BE TOLD ANY OF THAT, YOU HAVE NO BUSINESS ENGAGING IN SOPHISTICATED TRANSACTIONS FOR QUALIFIED INDIVIDUALS: GO PLAY ANGRY BIRDS INSTEAD. NO SOLICITATION OR OFFER TO SELL/SALE OR OFFER TO BUY/BUY IS MADE BY HEREIN. WRITTEN OR VERBAL COMMUNICATIONS RECEIVED FROM WRITER ARE INTENDED FOR EDUCATIONAL OR NEGOTIATION PURPOSES ONLY, MAY CONTAIN LEGAL PUFFERY, AND ARE NOT TO BE RELIED ON AS MATERIAL STATEMENTS OF FACT UNLESS CONTAINED IN WRITING AND WITHIN A FORMAL CONTRACT PROPERLY IDENTIFIED AS SUCH. UPON RECEIPT OF THIS COMMUNICATION, RECIPIENT ACKNOWLEDGES RECEIPT AND ACCEPTANCE OF THIS WARNING AND DISCLAIMER. RECIPIENT WARRANTS THEY HAVE BEEN PROVIDED BY ASPIRE LEASE AND FACTOR LLC THEIR STATUTORY, CASE AND COMMON LAW DECLARATIONS, WHICH DISCUSSES MANY WORSE CASE SCENARIOS AND IS AVAILABLE  ONDEMAND FROM: HTTP://WWW.ASPIRELEASEANDFACTOR.COM/DLSCL0SURES2OL62460LASPIRE. JURISDICTION = UT. (C) 2016-2017. SENDER IS RESPONSIBLE ONLY FOR HIS ACTIONS AND WORDS.

THIS WHITE PAPER CONTAINS FORWARD-LOOKING STATEMENTS. WORDS SUCH AS "EXPECTS," "INTENDS," "BELIEVES," "MAY," "MIGHT," "CAN," AND SIMILAR EXPRESSIONS REFLECTING SOMETHING OTHER THAN HISTORICAL FACT ARE INTENDED TO IDENTIFY FORWARD-LOOKING STATEMENTS, BUT ARE NOT THE EXCLUSIVE MEANS OF IDENTIFYING SUCH STATEMENTS. THESE FORWARD-LOOKING STATEMENTS INVOLVE A NUMBER OF RISKS AND UNCERTAINTIES, INCLUDING THE TIMELY DEVELOPMENT AND MARKET ACCEPTANCE OF PRODUCTS AND TECHNOLOGIES, THE ABILITY TO SECURE AND MANAGE SOURCES OF FINANCE, THE

ABILITY TO CONTROL OPERATING EXPENSES AND DEFAULT RATES, AND OTHER FACTORS NOT FULLY DESCRIBED HEREIN BUT WHICH ARE MATERIAL. THE ACTUAL RESULTS THAT ANY SYNDICATOR ACHIEVES MAY DIFFER SUBSTANTIALLY AND MATERIALLY FROM ANY FORWARD-LOOKING STATEMENT DUE TO SUCH RISKS AND UNCERTAINTIES. THE WRITER UNDERTAKES NO OBLIGATION TO REVISE OR UPDATE ANY FORWARD-LOOKING STATEMENTS IN ORDER TO REFLECT EVENTS OR CIRCUMSTANCES THAT MAY ARISE AFTER THE DATE OF THIS RELEASE. WE CAN'T POSSIBLY TELL YOU ALL THE WAYS YOU MAY MAKE DUMB DECISSIONS BUT PLEASE DON'T DO IT WITH US.YOU CAN'T TAKE YOUR MONEY WITH YOU, AND YOU MAY WELL LOSE IT BEFORE THEN. PLEASE EXERCISE CAUTION AND DISCRETION.



# Case Study – The Syndicator's View of Working Capital

*revised 28 April 2017*

Merchants everywhere are looking for funding sources for their business, but 86% of them did not fit the bank's narrow box last year. Credit markets remain tight for all but the most golden of borrowers, thus even profitable, successful businesses often find themselves looking for alternative sources of capital.

Discussed in the case study "The Merchant View of Working Capital" is the situation that merchants need funding but don't have many options. We reviewed the benefits and downside of the merchant borrowing from friends and family. Favorable terms are always desired, but cheaper may not be better. We also addressed the fundamental requirement that businesses know their margins before engaging in any transaction, whether friendly or at arm's length. As demonstrated, well run business with good margins may greatly accelerate its growth with a working capital advance, but a poorly run business that is not profitable will quickly see its demise. In this regard, working capital advances are like fuel on a fire, but whether the flame is productive or spirals out of control depends on the operations of the business. Working capital funders want to front capital to profitable businesses. Failing businesses means higher default rates and greatly diminished prospects of realizing a return.

<u>What are working capital advances?</u>

Working capital advances are defined as the purchase and sell of future receivables by a merchant. The merchant is saying that they will earn $xx in the future, and are willing to sell that income stream today for a discount on the future value. Today's advance is based on the future's revenue. In this way, working capital advances are like AR factoring, except that AR factoring is tied to the future receivable of a specific invoice whereas WC advances work for any future receivable of the merchant in a general sense.

AR factoring works great for merchants who create and deliver a tangible product to be paid for in the future (e.g. I'll ship you tires today and you'll pay for them on terms in 30 days; I'll submit that invoice for factoring and receive payment today from the factoring company, who will then be paid off when you pay for the tires in 30 days, less a transaction cost of course). But what about the purveyor who sells cheeseburgers? They deliver your delicious Angus burger in about 10 minutes, so invoice factoring doesn't seem viable. In this case, a working capital advance could be considered. Here, the funder would instead look and say, "I see you collect about $50,000 each month from selling juicy burgers, so I am willing to purchase a portion of your future burger sales and pay you for that today at a discounted rate. I will then collect a portion of your sales from you each day until I

receive back the amount I purchased." Since there is not a specific invoice, the working capital has claim on all funds received by the merchant.

What interest rates do working capital lines charge?

The short answer is none. That is because a working capital advance is not a loan. Any business that can fit through the bank's narrow credit window would have already received a loan from them, but 86% of all business did not make the cut last year. Despite the bad news from the banks, merchants still need liquidity and funding solutions.

A working capital advance considers the amount of future receivables to be sold, called the purchased amount, and the amount of money advanced to the merchant today, called the purchase price. The ratio between the purchased amount and the purchase price is referred to as the factor rate. For example, if the funder tells the merchant he will purchase $15,000 of his future sales and pay him $10,000 for it today, then the purchased amount is $15k and the purchase price is $10k, yielding a factor rate of 1.50. While many merchants will want to try to convert the factor rate into an APR, it isn't directly convertible, and in any case the funder will never ever call it a percentage rate, since APRs apply to loans and the purchase and sell of future receivables is specifically designed to not be a loan.

In any case, clearly working capital is not the cheapest form of capital. If a bank loan was available, the merchant would take it. But when a bank loan is not available, is tapped out, or needs to be preserved for unknown needs, the merchant seeks alternatives including working capital advances. In deciding whether to engage in a working capital advance transaction or not, the factor rate and term will be considered. Factors that drive the factor rate include term length, how credit worthy the merchant is, how big the advance is relative to their revenue, industry, the existing of other advances or liens, time in business, and other similar factors.

What is a syndicate partner?

A syndicate partner, or syndicator, can be many things which we will discuss. It is also important to mention what it is not. A syndicator is not lending money to anyone. A syndicator is not purchasing a security as there is no pooling of assets under common management. A syndicator chooses deals on a case by case basis and is in full control of his own decisions at all time.

In the most basic sense, a syndicate is a loose association of syndicators who combine to carry out a particular transaction. When referring to working capital, each syndicator is taking a portion of his investable cash assets and combining them with other syndicators to fund a working capital transaction. A syndicator may have a small percentage of the deal, or may take the majority of the transaction.

In working capital transactions, one of the syndicators takes the head position for preparing the transaction, presenting the terms, and executing on all duties and agreements. This person is called

the lead syndicator. The lead receives an administrative fee for his duties. This administrative fee is typically collected and deducted from each payment collected from the merchants, and typically ranges from 3% to 8%. The lead may also assume the role of the originator, collecting the documents from the merchant and providing the underwriting report to the potential syndicators.

Each syndicator chooses to participate on a deal by deal basis. The participation percentage of each deal is unique, and each syndicator can choose to fund more or less to a deal as they evaluate risk and return potential. Each deal can potentially have different factor rates, term length, admin fees and origination and sales commission costs.

<u>How does a syndicate partner get paid?</u>

The process by which a syndicator allocates and tracks his money give full transparency and full accountability. Each syndicator has his own login to the platform software and can see every deal including the full underwriting report. He is able to sort and review potential transactions by whatever criteria he prefers. Once he decides to participate in a deal, the syndicator then submits his desired participation level of how much of the deal he would be willing to fund. Of course, often deals are oversubscribed, and in those cases the lead will determine the allocation using established criteria. This always means the syndicate partners may up their participation limit knowing that they may not get as much of a transaction as they would like.

Once the syndicator receives confirmation of the amount of the deal he is funding, he submits his portion of the funds, known as the transaction participation amount. The transaction confirmation will also include notice of any front-end fees that cause the participation amount to be grossed up from the purchase price. These costs are disclosed on the platform software and are also provided in the syndication report, which the syndicator uses to calculate return expectations.

Once a deal is slated for funding and the fund underwriting and checks are completed, the merchant is funded, typically via a wire to their account. The lead files the UCC and arranges for the deductions of the merchant's account, usually starting the following day. If a Confession of Judgment (COJ) is utilized, that is also reviewed and filed for safekeeping.

The payments back from the merchant can be received by ACH debit, merchant credit card processing split, or physical drop box. On most deals, the merchant will pay the daily amount each business day (although custom schedules can be created).  After the payment is received, the lead splits the amount according to the participation percentage each syndicate partner contributed. The syndicator receives their participation portion, called the right to receive amount, less the lead's administrative fee (typically from 3 to 8%).

The syndicator receives his funds through a daily sweep which aggregates all amounts received from the various deals the syndicator is participating in. A daily report provides the syndicator with all the details. Additionally, the syndicate partner has a reporting engine available to fully track his

investments and provide reporting on his capital gains to his accountant. Most syndicators will take their returns and syndicate them into future transactions, which enables them to earn tremendous compounding due to the daily payments, but the syndicator can make that determination on a case by case and deal by deal basis.

How transparent is it?

All reputable working capital funders utilize platform software that makes every transaction fully transparent to each syndicator by showing them what their Right to Receive amount is, potential return, actual return, and details on each transaction. Most platforms will also include underwriting modules to allow you to see the details on each potential deal so you can decide which ones you want to participate in and to what degree. Remember, of course, that over subscriptions are common, so you may not receive the full amount you indicate. As each ACH payment comes in, you'll see your right to receive amount, which you receive offset only by the management fee via an ACH credit to your account.

Lead working capital funders want their syndicate partners to have full access to optics so that they can make the best, well-informed decisions possible. Because evaluating, tracking, and analyzing performance is so vital to your return and risk management, consider a working capital lead that utilizes current software that is powerful and easy to use. The lead will provide you with training on how to utilize the platform software.

Are my funds commingled with others?

No! Working capital syndication is about taking a portion of a working capital transaction on equal footing as the other syndicators and the lead. You decide case by case and deal by deal if you want to participate and to what degree you wish to participate. You decide to embark and disembark independent of other syndicators.

Because working capital transaction are designed to be originated, underwritten and funded quickly, you or a designated member of you team will need to be tasked with monitoring your investments, but what you decide to do is fully independent of what other syndicators decide to do. Typically, we recommended not taking 100% of any deal, but even that is a possibility if you feel strongly about the opportunity (typically this only happens at the book ends of the risk spectrum where a funder feels the exceptional return is worth the risk, or where the risk is evaluated to be very low and worth the potential return).

What kind of track record should I look for?

Nearly every sophisticated investor can repeat the mantra verbatim "past performance is no guarantee of future results." This declaimer is of course true. Indeed, there are no guarantees! Not on return, not on performance, and not on security. Yet results must be considered to some degree. Investments in securities always include certain standardized results such as average annual returns

and 30-day yields. Even private placement securities like hedge funds have results that are shared with prospective and current investors.

Syndication is more difficult at the outset, however, but only for logistical reasons. One of the first consideration is that each syndicator makes their own decisions on which deals to invest in and to what degree. This means that no two syndicate investors will chose to participate in the same underling transactions, and certainly not to identical degrees. Because your funds are not commingled in a pool, there is not a standardized result to publish. A lead cannot tell John Doe how much Jane Doe made, since John won't be investing identical to Jane.

The second practical issue is that in most investments, investors look for a substantial track record. Yet in working capital transactions, the performance is often so exceptional versus competing investments that the working capital funder quickly finds himself no longer interested in additional external syndicators. From internal and established external sources he has sufficient funds, and so the lead is then only interested in syndicators that bring additional services, such as established deal flow (for additional enlightened reading on this unique concept, see Sean Murray's article "So You Want to Participate" in the March 2014 deBanked magazine). Once a lead is established, they typically turn syndicators away, with some leads reporting that they receive hundreds of calls a month offering millions of dollars – offers for which they have absolutely no interest. This phenomenon unique to working capital means that a potential syndicator spends time getting familiar with the potential of the lead instead of evaluating the performance of the lead. Luckily, since the syndicator remains in control of his funds and in driver's seat of his deal participation, risk is greatly reduced in those areas.

<u>What is protecting my funds?</u>

First, we must reiterate that every investment contains risks. There are known knowns, and known unknowns, but it is the unknown unknowns that have the biggest potential to hurt you. For example, financial planners will tell you that there is a significant risk of placing all of your assets in FDIC insured bank accounts. What is the risk? The risk is that saving accounts and CD's are virtually guaranteed to not keep up with inflation. Even with "low" 3% inflation, your purchasing power will decrease by over 60% over a typical retirement period. Surprisingly high inflation will wipe away wealth even faster. This means that a well-designed portfolio must have both conservative assets to protect against valuation swings and more aggressive assets to protect against inflation and longevity risks. Working capital syndication should be considered the type of asset class used to potentially protect against inflation.

Working capital syndication is an alternative asset class that in many ways is a hybrid between equity and debt investments. The purchase and sale of future receivables is a capital investment. The returns will be taxed as capital gains, not as interest, and any losses can be used to offset the gain amounts on a one-to-one basis. On the other hand, there is an intrinsic and relatively predictable revenue stream from working capital.

When evaluating a working capital syndication opportunity, it is important to calculate for a degree of default. Some merchants will not make the payments, and sometimes the payments will come but just slower than anticipated. While this is also true of investment grade bond investments, the risk here is more certain, which in some ways helps in addressing the risk. In any case, diversification should be mandatory.

The lead should also carry a professional liability policy against errors and omissions in the execution of their duties. We recommend the policy to be at least $250,000 face value and should be in addition to any property or casualty insurance the lead may carry. The E&O policy should be reviewed for coverages to ensure you are protected against errors on the part of the lead.

Finally, protecting your assets is the underwriting of each specific transaction. The lead will provide you with the underwriting and origination criteria and results. Each syndicator may decide on the risk and return profiles that fit their portfolio. The platform system should enable the syndicator to analyze deals based on factors such as industry, capitalization rate, geographic location, transaction size, time in business and performance of prior transactions. With more aggressive transactions, a Confession of Judgment (COJ) is often used by the lead to propel the collection to the front of the line should the merchant undergo difficulties. Thankfully, a COJ usually helps in resolving advances to struggling merchants prior to legal proceedings by aligning the interests of all parties.

<u>If I think I'm ready, how do I begin?</u>

It may well feel overwhelming, yet the return structure and investment potential may be compelling. A good lead will help you with this conundrum by providing you with all the help you need, including a road map. Typically, the potential syndicator will provide an indication of interest and proof of funds to the lead. The lead will then provide the potential syndicator with a due diligence package, which will contain model contracts, a list of service providers and partners, insurance policies, and numerous conversations to address any questions.

As the potential syndicator gets closer to engaging, he'll need to make sure his own team is in place, including competent accountants, legal advisors and financial planners. He many also need to designate a member of his team to be the point for the syndicator portal for the group and performing duties such as deal review and approval, cash flow analysis, portfolio strategy and structuring, and reporting. A good lead will provide you with much assistance on learning how to ride this new bike, but ultimately, you'll need to pedal for yourself. The tools will take you far, but your own legs will take you the distance. The preparation required of the syndicator is not hard or burdensome, but it is important to do it right.

<u>Summary</u>

We hope this Case Study has been educational and has addressed questions you may have. Please remember that this Case Study is not an offer of any kind, and please take time to review the important disclaimers below. We welcome the opportunity to answer any questions you may have.

Source: Aspire Lease and Factor LLC

**Aspire Lease and Factor**
**3305 Mayflower, Ste 3B**
**Lehi UT 84043**
**(949) 478-2670**
**contact@AspireLeaseAndFactor.com**



<u>Notice:</u>

EVERYONE THINKS THESE DISCLOSURE STATEMENTS ARE LAME, AND WRITER IS NO EXCEPTION, YET SOMEHOW LEGAL COUNSEL ALWAYS ADVISES INCLUDING A SILLY DISCLAIMER ALTHOUGH IT IS QUESTIONABLE WHETHER DOING SO HAS EVER HELPED ANYONE. TO PROVIDE EXTRA PROTECTION, THIS WARNING IS EXTRA SILLY, NEVERTHELESS PLEASE TAKE HEED. PLEASE BE AWARE THAT THE CONTENTS OF THIS WHITE PAPER (AND ANY ATTACHMENTS) ARE PRIVATE AND ARE INTENDED TO STAY PRIVATE, AND MAY CONTAIN CONFIDENTIAL OR PRIVILEGED INFORMATION. SHARING PRIVATE INFORMATION WASN'T NICE IN KINDERGARTEN, AND IT IS NO BETTER NOW THAT YOU ARE SUPPOSEDLY MORE MATURE. IF YOU RECEIVED THIS COMMUNICATION IN ERROR, PLEASE PROMPTLY NOTIFY THE SENDER THEN IMMEDIATELY DELETE THE CONTENTS OF THE COMMUNICATION.

THE WRITER OF THIS WHITE PAPER ENGAGES IN COMMERCIAL LENDING SERVICES AS PROVIDED BY LAW. CLEARLY, WRITER IS NOT ENGAGED AS YOUR ATTORNEY, ACCOUNTANT, TAX ADVISOR, INVESTMENT ADVISER, BROKER, CONSUMER BANKER, REAL ESTATE AGENT, MEDICAL DOCTOR, PSYCHOLOGIST OR LOVER.  IF YOU NEED TO BE TOLD ANY OF THAT, YOU HAVE NO BUSINESS ENGAGING IN SOPHISTICATED TRANSACTIONS FOR QUALIFIED INDIVIDUALS: GO PLAY ANGRY BIRDS INSTEAD. NO SOLICITATION OR OFFER TO SELL/SALE OR OFFER TO BUY/BUY IS MADE BY HEREIN. WRITTEN OR VERBAL COMMUNICATIONS RECEIVED FROM WRITER ARE INTENDED FOR EDUCATIONAL OR NEGOTIATION PURPOSES ONLY, MAY CONTAIN LEGAL PUFFERY, AND ARE NOT TO BE RELIED ON AS MATERIAL STATEMENTS OF FACT UNLESS CONTAINED IN WRITING AND WITHIN A FORMAL CONTRACT PROPERLY IDENTIFIED AS SUCH. UPON RECEIPT OF THIS COMMUNICATION, RECIPIENT ACKNOWLEDGES RECEIPT AND ACCEPTANCE OF THIS WARNING AND DISCLAIMER. RECIPIENT WARRANTS THEY HAVE BEEN PROVIDED BY ASPIRE LEASE AND FACTOR LLC THEIR STATUTORY, CASE AND COMMON LAW DECLARATIONS, WHICH DISCUSSES MANY WORSE CASE SCENARIOS AND IS AVAILABLE  ON DEMAND FROM: HTTP://WWW.ASPIRELEASEANDFACTOR.COM/DLSCL0SURES2OL62460LASPIRE. JURISDICTION = UT. (C) 2016-2017. SENDER IS RESPONSIBLE ONLY FOR HIS ACTIONS AND WORDS.

THIS WHITE PAPER CONTAINS FORWARD-LOOKING STATEMENTS. WORDS SUCH AS "EXPECTS," "INTENDS," "BELIEVES," "MAY," "MIGHT," "CAN," AND SIMILAR EXPRESSIONS REFLECTING SOMETHING OTHER THAN HISTORICAL FACT ARE INTENDED TO IDENTIFY FORWARD-LOOKING STATEMENTS, BUT ARE NOT THE EXCLUSIVE MEANS OF IDENTIFYING SUCH STATEMENTS. THESE FORWARD-LOOKING STATEMENTS INVOLVE A NUMBER OF RISKS AND UNCERTAINTIES,

INCLUDING THE TIMELY DEVELOPMENT AND MARKET ACCEPTANCE OF PRODUCTS AND TECHNOLOGIES, THE ABILITY TO SECURE AND MANAGE SOURCES OF FINANCE, THE ABILITY TO CONTROL OPERATING EXPENSES AND DEFAULT RATES, AND OTHER FACTORS NOT FULLY DESCRIBED HEREIN BUT WHICH ARE MATERIAL. THE ACTUAL RESULTS THAT ANY SYNDICATOR ACHIEVES MAY DIFFER SUBSTANTIALLY AND MATERIALLY FROM ANY FORWARD-LOOKING STATEMENT DUE TO SUCH RISKS AND UNCERTAINTIES. THE WRITER UNDERTAKES NO OBLIGATION TO REVISE OR UPDATE ANY FORWARD-LOOKING STATEMENTS IN ORDER TO REFLECT EVENTS OR CIRCUMSTANCES THAT MAY ARISE AFTER THE DATE OF THIS RELEASE. WE CAN'T POSSIBLY TELL YOU ALL THE WAYS YOU MAY MAKE DUMB DECISIONS BUT PLEASE DON'T DO IT WITH US. YOU CAN'T TAKE YOUR MONEY WITH YOU WHEN YOU DIE, AND YOU MAY WELL LOSE IT BEFORE THEN. PLEASE EXERCISE CAUTION AND DISCRETION.